In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1076

NATHAN HICKEY,

*Plaintiff-Appellant,*

*v.*

PROTECTIVE LIFE CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:18-cv-03018 — **Thomas P. Schanzle-Haskins**, *Magistrate Judge.*

SUBMITTED OCTOBER 28, 2020 — DECIDED FEBRUARY 12, 2021

Before RIPPLE, WOOD, and BRENNAN, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Nathan Hickey brought this action under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.[1] In his complaint, he alleged that his

---

[1] The jurisdiction of the district court is based on 28 U.S.C. § 1331. During briefing on the summary judgment motion, the parties consented to

(continued … )

former employer, Protective Life Corp. ("Protective"), had interfered with the exercise of his rights under the FMLA and had retaliated against him for exercising those rights. In due course, Protective filed a motion for summary judgment; in his response, Mr. Hickey abandoned his retaliation claim. After notice to the parties, the district court granted the motion on a ground not raised explicitly by the parties. It held that Mr. Hickey could not succeed on his interference claim because he was unable to prove that he had suffered any monetary damages as a result of the alleged interference or was otherwise entitled to equitable relief.

In determining that Mr. Hickey had not raised a genuine issue for trial, the district court refused to consider a supplemental declaration filed by Mr. Hickey that, according to the district court, contradicted Mr. Hickey's deposition testimony.

We affirm the judgment of the district court.[2] The district court correctly concluded that, in the absence of evidence that Mr. Hickey suffered harm for which the FMLA provides a monetary or equitable remedy, Mr. Hickey does not have a cognizable action for interference under the FMLA. Moreover, the district court did not abuse its discretion in refusing to consider Mr. Hickey's supplemental declaration as evidence of damages.

---

( … continued)

referral of the case, for all matters including final judgment, to a magistrate judge. *See* R.19.

[2] Our jurisdiction is secure under 28 U.S.C. § 1291.

**I**

**BACKGROUND**

**A.**

Mr. Hickey began working for Protective as an Account Executive in its Asset Protection Division on November 8, 2015. Mr. Hickey's primary task was to sell Protective's warranty and insurance products through auto dealerships. His territory extended from "south of Bloomington[, Illinois,] to Southern Illinois and west into Missouri."[3] As part of his responsibilities, he oversaw two large, established accounts, the Chris Auffenberg and Jamie Auffenberg dealerships, as well as one smaller account, Ike Honda. His goals were both to increase production in these existing accounts as well as to develop new accounts. Mr. Hickey's compensation structure comprised a base salary, commissions for the sales from his assigned dealerships, and commissions on new accounts.

Around September 30, 2016, Mr. Hickey informed his supervisor, Regional Sales Manager Chris Courtney, that his grandmother was in poor health and that he might need time off. Courtney forwarded Mr. Hickey's email to Anne Witte, who worked in Protective's human resources department and was knowledgeable about the types of leave available to Mr. Hickey.

In the middle of November 2016, Mr. Hickey was struggling with anxiety and depression following his grandmother's illness and death; on November 16 or 17, he initiated a request for FMLA leave. On November 29, Protective's ad-

---

[3] R.17-1 at 7 (Hickey Dep. 20:13–14).

ministrator sent Mr. Hickey a letter approving his leave retroactive to November 17, 2016, and continuing through December 14, 2016. Ultimately, Mr. Hickey received approval for his full twelve weeks of leave under the FMLA, and he did not return to work until February 17, 2017.

While Mr. Hickey was on leave, Protective acquired U.S. Warranty. In an affidavit that Mr. Hickey submitted in opposition to Protective's motion for summary judgment, Mr. Hickey explains:

> When I was preparing to return to work, I spoke with Chad Reeser (U.S. Warranty Regional Manager) and Steve Potts (U.S. Warranty Division Manager) regarding a job (within Protective) that they wanted me to take. That job was as an account executive on the U.S. Warranty side under Steve Potts. Mr. Potts offered me the job. At that time Mr. Potts was a manager at Protective. I decided that I would accept the position and advised Mr. Potts of my decision.[4]

In his earlier deposition, however, Mr. Hickey recounted events differently. He stated that Potts had told him that he (Potts) wanted Mr. Hickey "to become a member of his team,"[5] that Mr. Hickey "would be receiving an offer from him,"[6] and that he (Potts) would be "looking for

---

[4] R.23-1 ¶ 20.

[5] R.17-1 at 36 (Hickey Dep. 134:12).

[6] *Id*. (Hickey Dep. 134:15).

[Mr. Hickey's] application."[7] Later in his deposition, Mr. Hickey testified that, sometime after February 20, 2017, he had emailed Witte to ask about "the status of [his] application with US Warranty."[8] Indeed, in an email sent by Mr. Hickey on February 27, 2017, Mr. Hickey explained that he "had spoken to a colleague with our new branch [U.S. Warranty] who said they are waiting for my information for application. Any update on that or things I should do to make me the best candidate for that move?"[9] At no time during his deposition did Mr. Hickey testify that he had been offered a position at U.S. Warranty or that he had accepted that offer.

On February 20, 2017, Mr. Hickey met with Witte, Courtney, and Divisional Vice President Kevin Hausch in St. Louis.[10] During the course of that meeting, Courtney explained to Mr. Hickey that, upon his return to work, he would have a territory closer to his home, that he would not be servicing the Auffenberg accounts or Ike Honda, and that he would need to build up his own book of business. His commissions, however, would remain constant for six months.

---

[7] *Id.* (Hickey Dep. 135:1).

[8] *Id*. at 37 (Hickey Dep. 138:17).

[9] R.17-28 at 2.

[10] According to Protective's reporting chain, Courtney reported to the Regional Vice President, Matt Keller, who reported to the Divisional Vice President, Kevin Hausch.

On March 3, 2017, Mr. Hickey received his fourth-quarter evaluation which indicated that, due to his leave, he had not started his fourth-quarter goals. He also received his year-end evaluation. The evaluation reflected an overall rating of "inconsistent" for 2016.[11] Courtney testified that he based the "inconsistent" rating on Mr. Hickey's record of servicing clients prior to his leave. Although Mr. Hickey admits that, prior to taking leave, he was told that he "needed to be more proactive with the Ike Honda account,"[12] he disputes that there were problems with the Auffenberg accounts that were attributable to him.[13] Under Protective's policies, Mr. Hickey's "inconsistent" rating rendered him ineligible for an internal transfer to a different position.[14]

During that same month, March 2017, Mr. Hickey attended Protective's Asset Protection Division conference in Dallas. While there, Mr. Hickey spoke to at least one other attendee about his desire to transfer to a position at U.S. Warranty. Tim Blochowiak, Vice President of Dealer Sales,[15] met with Mr. Hickey and asked that he refrain from discuss-

---

[11] *See* R.17-30 at 4.

[12] *See* R.23 at 6.

[13] Mr. Hickey also maintains that, prior to the fourth quarter, he had no performance issues. Mr. Hickey suggests that, while he was on leave, Courtney authored a tepid third-quarter review to justify his 2016 rating. *See* Appellant's Br. 23–24.

[14] *See* R.17-1 at 42 (Hickey Dep. 160:10–15).

[15] Blochowiak was immediately above Hausch in the reporting chain.

ing the possibility of a transfer at the conference. After this meeting, it was clear to Blochowiak that Mr. Hickey did not want to be in his current position, and Blochowiak contacted human resources to discuss options. Later that day, Blochowiak met again with Mr. Hickey, informed him that a transfer was not available, and offered him a severance package so that he could leave Protective on good terms. Blochowiak asked Mr. Hickey to keep the offer in confidence and to give him an answer in the next couple of days.

That same evening, Blochowiak learned that, contrary to his explicit instructions, Mr. Hickey had mentioned his desire to transfer and the severance package to another employee. Blochowiak had a follow-up meeting with Mr. Hickey in which he reiterated that he did not want Mr. Hickey to discuss the possibility of transferring; he further said that Protective needed an answer on the severance offer. Mr. Hickey told Blochowiak that he believed he was being pressured out of the company.

Following this second meeting with Mr. Hickey, Blochowiak again spoke with human resources and then again met with Mr. Hickey. During this final meeting, Blochowiak made the decision to end Mr. Hickey's employment for two reasons. First, it was Blochowiak's perception that Mr. Hickey had lied to him: Mr. Hickey had denied having discussions with others about a possible transfer and the severance offer, but other employees had reported those conversations to Blochowiak. Second, it was clear to

Blochowiak that Mr. Hickey had no interest in continuing to work for Courtney.[16]

**B.**

Mr. Hickey filed this action in which he alleged that Protective had interfered with the exercise of his rights under the FMLA and had retaliated against him for exercising those rights. He set forth three unlawful acts in his complaint: (1) his fourth-quarter performance review, (2) the denial of his transfer, and (3) the termination of his employment. He requested "[a] determination that Protective violated [hi]s rights under the FMLA"; "[a]n order reinstating [him] to his position of employment"; "[a]n order directing Protective to compensate him for his lost wages and benefits"; liquidated damages; and attorney's fees.[17]

Following discovery, Protective moved for summary judgment on all of Mr. Hickey's claims. It maintained that Protective had not interfered with Mr. Hickey's taking his FMLA leave, nor had it retaliated against him. It stated that Mr. Hickey's 2016 performance review reflected his performance before his FMLA leave. It also submitted that the termination of Mr. Hickey's employment was based solely on his interactions with Blochowiak and had nothing to do with his FMLA leave.

In his response, Mr. Hickey conceded that the termination of his employment was not retaliatory and that Protec-

---

[16] *See* R.16 at 16.

[17] R.1 at 4–5.

tive was entitled to summary judgment on that claim.[18] He maintained, however, that summary judgment should be denied on his interference claim. First, he argued that whether Protective had interfered with his FMLA leave by downgrading his performance evaluation was a question of fact for the jury.[19] He also contended that a jury could conclude that he was not reinstated to his former or an equivalent position because he was required to prospect for additional clients, which was more difficult than working with existing clients. Mr. Hickey neither admitted nor denied Blochowiak's recollection regarding the events leading up to and culminating in the termination of Mr. Hickey's employment. Consequently, pursuant to local rule, the district court deemed them admitted.[20]

In its reply, Protective claimed that there was no genuine issue of material fact as to whether Mr. Hickey had been returned to an equivalent position. Mr. Hickey had testified that, when he returned to work, he had the "same title," "the same manager," "the same team," sold "the same products," was guaranteed "the same pay" (for six months), and that he did not consider the new job "inferior."[21] Protective also

---

[18] *See* R.23 at 3 ("In his complaint Hickey also alleged that he was terminated in retaliation for taking a protected leave of absence. … For the purposes of this motion, Hickey is not challenging Protective's entitlement to summary judgment as to this limited issue.").

[19] *See id*. at 32.

[20] *See* R.30 at 8 n.2.

[21] R.24 at 11 (quoting R.17-1 at 54 (Hickey Dep. 208:8–209:19)).

submitted that Mr. Hickey's "claim[] that[,] but for his 2016 Overall Performance rating[,] he would have been allowed to transfer to a different position, … [was] entirely speculative."[22] It maintained that, even if Mr. Hickey had been eligible for a transfer, he "was not entitled to a transfer, there is no guarantee that [he] would have been selected for any transfer, denial of an essentially lateral transfer is not an adverse action, and [he] ultimately was terminated for reasons unrelated to his FMLA leave."[23]

Following briefing, the court notified the parties that it was considering granting summary judgment on a ground that they had not explicitly raised.[24] Specifically, it noted that, to recover under the FMLA, a plaintiff must show monetary damages resulting from the alleged interference. However, Mr. Hickey had agreed that his compensation had not been reduced and would not be reduced for six months following his return to work. Additionally, Mr. Hickey had not come forward with any evidence that he had been offered a transfer; the mere possibility of a transfer was too speculative of a basis for relief. The court acknowledged that, in the declaration attached to his opposition brief, Mr. Hickey stated—for the first time—that Steve Potts at U.S. Warranty had offered him a job. However, the court noted that this assertion directly contradicted multiple statements in Mr. Hickey's deposition where he spoke of his

---

[22] *Id.* at 15.

[23] *Id.*

[24] *See* R.25 at 1 (citing Fed. R. Civ. P. 56(f)(2)).

application to U.S. Warranty, as opposed to an offer and acceptance. The district court therefore refused to consider the affidavit.

The parties filed supplemental memoranda addressed to the issue of damages. The district court ultimately concluded that Mr. Hickey could not show that any interference with his FMLA leave resulted in monetary damages or entitled him to equitable relief. According to the district court, Mr. Hickey's employment was terminated because he had lied to Blochowiak and because he had refused to work for Courtney. Neither of these reasons had any relationship to his FMLA leave. Because the termination of his employment was lawful, Mr. Hickey was not entitled to reinstatement.

The district court also determined that Mr. Hickey was not entitled to reinstatement to a different position at U.S. Warranty because he had not come forward with any evidence that he would have gotten the position at U.S. Warranty even if he had been eligible to apply for it. Because Mr. Hickey had "fail[ed] to present any evidence of any economic harm from the claimed interference and any evidence that he would [have] be[en] entitled to equitable relief," Mr. Hickey was "not entitled to relief under the FMLA."[25] The district court therefore entered summary judgment for Protective.

Mr. Hickey timely appealed.

---

[25] R.30 at 19.

## II

## DISCUSSION

Section 2615(a)(1) of Title 29 of the United States Code makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided in the FMLA. Among the rights guaranteed by the FMLA is the right of the employee "to be restored" to the same position as he held when the employee's leave commenced or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(A), (B); *see also Breneisen v. Motorola, Inc.*, 512 F.3d 972, 977 (7th Cir. 2008) (noting that an interference claim can be based on the employer's failure to reinstate the employee to the same or an equivalent position and reversing summary judgment in favor of Motorola because Breneisen had raised a genuine issue of material fact as to whether he had been reinstated to an equivalent position).[26] To prevail on an FMLA interference claim,

> the employee must establish that: (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled.

---

[26] *See also Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 186–89 (4th Cir. 2017) (discussing contours of "interference" claim based on a failure to reinstate an employee).

*Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (citing *Hoge v. Honda Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). "[A]n employee need only show that his employer deprived him of an FMLA entitlement; no finding of ill intent is required." *Id.*; *see also Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010) (stating that, with respect to an FMLA interference claim, "[t]he employee need not allege that his employer intended to deny the benefit, because 'the employer's motives are irrelevant'" (quoting *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206–07 (11th Cir. 2001)).[27]

The remedies for violations of § 2615 are set forth in 29 U.S.C. § 2617. That section provides, in relevant part, that an employer "who violates section 2615 of this title shall be liable to any eligible employee affected … for damages equal to … the amount of … any wages, salary, employment benefits, or other compensation denied or lost to such employee *by reason of the violation*." *Id*. § 2617(a)(1)(A)(i)(I) (emphasis add-

---

[27] Section 2615(a)(2) of Title 29 "makes it 'unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by' the FMLA." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 819 (7th Cir. 2015) (quoting 29 U.S.C. § 2615(a)(2)). We have recognized that demoting or firing an employee for taking a valid leave falls within this prohibition. *See id.*; *see also Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 667 (7th Cir. 2008). "[R]etaliation claims under the FMLA require that: (1) the employee engaged in statutorily protected activity; (2) the employer subjected her to an adverse action; and (3) the protected activity caused the adverse action." *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018). As noted, *see supra* note 18, and accompanying text, Mr. Hickey abandoned his retaliation claim in the district court.

ed). It also provides for the recovery of "any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care." *Id*. § 2617(a)(1)(A)(i)(II). Finally, it allows a court to award "equitable relief as may be appropriate, including employment, reinstatement, and promotion." *Id*. § 2617(a)(1)(B). Thus, in order to recover under the FMLA, a plaintiff must show that he suffered damage, which (1) is redressable under § 2617 and (2) results from the alleged interference. In the absence of such evidence, summary judgment for the employer is appropriate. *See Cianci v. Pettibone Corp.*, 152 F.3d 723, 728–29 (7th Cir. 1998).

*Cianci v. Pettibone Corp.* illustrates the necessary connection between harm and recovery under the FMLA. In that case, the plaintiff had requested FMLA leave, which the employer improperly denied. Prior to the date that the plaintiff would have begun her requested leave, her employment was terminated, and she brought an action alleging that the termination violated the FMLA and other federal employment statutes. Before we turned to the merits of Cianci's FMLA claim, we first addressed "whether Cianci ha[d] a remedy under the FMLA." *Id.* at 728. We concluded that, because Cianci's employment had been terminated before she suffered any denial of her rights, no recovery was available. We explained that

> [t]he FMLA provides for compensatory damages equal to the amount of wages, salary, employment benefits, or other compensation the employee was denied or lost. 29 U.S.C. § 2617(a)(1)(A)(i)(I). If the employee was not denied or did not suffer a loss of income, the

> employee may recover other actual monetary losses that directly resulted from the violation. 29 U.S.C. § 2617(a)(1)(A)(i)(II). Cianci did not suffer any diminution of income, and, on the record before us, incurred no costs as a result of the alleged violation. Although Cianci's complaint seeks $300,000 in compensatory and punitive damages, the record contains no support for this request. Significantly, when asked at oral argument, Cianci's counsel was unable to tell us what relief the FMLA could provide to his client.

*Cianci*, 152 F.3d at 728–29. We therefore affirmed the district court's grant of summary judgment to Cianci's employer on her FMLA claim.

A few years later, the Supreme Court described recovery under § 2617 in much the same terms as we did in *Cianci*: as limited and as requiring a direct connection between the harm suffered and the damages sought. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). The Court explained:

> To prevail under the cause of action set out in § 2617, an employee must prove, as a threshold matter, that the employer violated § 2615 by interfering with, restraining, or denying his or her exercise of FMLA rights. Even then, § 2617 provides no relief unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation,"

§ 2617(a)(1)(A)(i)(II), and for "appropriate" eq-
uitable relief, including employment, rein-
statement, and promotion, § 2617(a)(1)(B). The
remedy is tailored to the harm suffered.

*Ragsdale*, 535 U.S. at 89.

Mr. Hickey maintains that Protective interfered with the
exercise of his rights under the FMLA in two ways. First, the
fact that he took FMLA leave negatively impacted his
fourth-quarter and year-end reviews, in violation of 29
C.F.R. § 825.220(c) (stating that "employers cannot use the
taking of FMLA leave as a negative factor in employment
actions, such as hiring, promotions or disciplinary actions").
Second, upon returning from leave, he was not restored "to
an equivalent position with equivalent … terms and condi-
tions of employment." 29 U.S.C. § 2614(a)(1)(B). To survive
summary judgment, Mr. Hickey had to come forward with
evidence from which a jury could conclude that he suffered
damages attributable to one of these adverse actions for
which the FMLA provides relief.

Here, when Mr. Hickey returned from his FMLA leave,
he initially received the same salary and benefits as he had
received prior to his leave. Under the arrangement given
him upon his return, his compensation could have dimin-
ished after six months if he had stayed in Protective's em-
ploy for that period. However, his employment with Protec-
tive terminated approximately three weeks after his return
for reasons unrelated to his having taken FMLA leave. Thus,
like the plaintiff in *Cianci*, although Mr. Hickey eventually
may have suffered damages had he remained employed
with Protective, he had not suffered any compensable dam-
ages under § 2617(a)(1)(A)(i) at the time his employment was

terminated. Therefore, even if we assume, *arguendo*, that the compensation arrangement given him upon his return violated the statute (a question we need not and do not decide), Mr. Hickey never incurred any damages attributable to that compensation decision.

In addition to the damages set forth in § 2617(a)(1)(A), § 2617(a)(1)(B) also allows a court to award "equitable relief as may be appropriate, including employment, reinstatement, and promotion." In Mr. Hickey's view, had Protective returned him to an equivalent position, no breakdown in the employment relationship would have occurred and he therefore is entitled to reinstatement to his former position.

We cannot accept this argument. Mr. Hickey did not dispute the facts surrounding the termination of his employment: that Blochowiak terminated his employment for his lack of truthfulness and discretion related to his desire to transfer and his severance offer. Because the termination of his employment was unrelated to any activity protected by the statute, the statute's remedial provisions cannot be invoked to require his reinstatement. *Cf. McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 361–62 (1995) (holding that, under the ADEA, neither reinstatement nor front pay is appropriate when, subsequent to the statutory violation, the plaintiff's employment has been terminated for legitimate reasons).

Alternatively, Mr. Hickey maintains that the evidence establishes that he "had actually been offered a different job" at U.S. Warranty and, therefore, reinstatement to that posi-

tion, or front pay in lieu of reinstatement, is appropriate.[28] The only evidence supporting his claim that he had been offered a position with U.S. Warranty, however, is Mr. Hickey's supplemental affidavit, which the district court refused to consider. We review the district court's exclusion of an affidavit for an abuse of discretion. *See Kopplin v. Wisconsin Cent. Ltd.*, 914 F.3d 1099, 1102 (7th Cir. 2019).

"As a general rule, the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996).[29] Indeed, even affidavits that are not directly contradictory may be excluded under this rule. In *Buckner*, for example, the plaintiff had slipped and fallen in a Sam's Club; despite a search, the object that caused the fall never was recovered. At her deposition, the plaintiff disclaimed "knowing precisely what the object was, but she did offer some commentary on its physical nature, describing it as 'uneven and faulty' and 'lumpy.'" *Id.* at 293. Later, in her affidavit, she was much more specific, stating that "the object 'felt to be about the size of a ladies' watch, which is one of the types of items that were on the display tables'" near where she fell. *Id.* at 292. The district court struck the affidavit, and, on appeal, we concluded the district court had not abused its discretion in doing so. We explained:

---

[28] *See* Appellant's Br. 29.

[29] *See also Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1055–56 (7th Cir. 2000).

The concern in litigation, of course, is that a party will first admit no knowledge of a fact but will later come up with a specific recollection that would override the earlier admission. Linda's affidavit falls into this category. Instead of offering a description using general terms ("rounded," "about a third to half an inch thick"), the affidavit describes the previously unknown object as feeling like a "watch," and a "ladies' watch" no less, one of the few objects that could directly link Sam's Club with the accident. In the context of opposing a motion for summary judgment, and when contrasted with a clear prior statement disclaiming knowledge of the object, this highly specific description appears to be an effort to undo (contradict) the effects of the deposition testimony and thereby establish the missing causal link between the store and the fall. This is certainly a conclusion the district court could have rationally made, which for purposes of our review was not an abuse of discretion.

*Id.* at 293.

Here, the difference in Mr. Hickey's deposition testimony and his declaration is much closer to a clear contradiction than the statements in *Buckner*. In his deposition, Mr. Hickey testified that Potts had told Mr. Hickey that he wanted Mr. Hickey "to be a part of his team,"[30] that Mr. Hickey

---

[30] R.17-1 at 36 (Hickey Dep. 134:22).

"would be receiving an offer from him,"[31] and that he (Potts) would be "looking for [Mr. Hickey's] application."[32] Later in his deposition, Mr. Hickey testified that, sometime after February 20, 2017, and after his leave had ended, he had inquired as to the "status of [his] application with US Warranty."[33] Additionally, on February 27, 2017, Mr. Hickey had informed human resources that he had spoken to someone at U.S. Warranty who was "waiting for [his] information for application" and asked whether there was "[a]ny update on that or things [he] should do to make [him] the best candidate for that move[.]"[34] All of these statements establish that Mr. Hickey was anticipating, but had not yet received, an offer from U.S. Warranty.

In contrast, in his declaration, Mr. Hickey transforms the expected offer into an offer that not only had been extended, but also had been accepted. He states: "Mr. Potts offered me the job. … I decided that I would accept the position and advised Mr. Potts of my decision."[35] Moreover, in his affidavit, Mr. Hickey places the completion of this agreement prior to his return to work;[36] however, his deposition testimony

---

[31] *Id.* (Hickey Dep. 134:15).

[32] *Id.* (Hickey Dep. 135:1).

[33] *Id.* at 37 (Hickey Dep. 138:17).

[34] R.17-28 at 2.

[35] R.23-1 ¶ 20.

[36] *See id.*

clearly establishes that, after his return to work, he still was in the process of applying to U.S. Warranty.

Here, as with the affidavit in *Buckner*, Mr. Hickey's declaration provides a necessary, previously missing element of the cause of action. In *Buckner* it was causation;[37] here it is damages. Without his supplemental declaration, Mr. Hickey faced the possibility of an adverse judgment because he had not come forward with any basis for monetary damages or reinstatement under the FMLA. Like the district court in *Buckner*, the district court rationally concluded that Mr. Hickey's declaration was an effort to undo the deposition testimony that precluded his recovery.

Other than Mr. Hickey's declaration, there was no other evidence to support Mr. Hickey's claim that he had been offered a position with U.S. Warranty. Consequently, like the district court, we conclude that Mr. Hickey has not come forward with any evidence supporting his claim that he should be reinstated to a different position.

## Conclusion

Mr. Hickey did not suffer any loss of wages or benefits prior to his employment being terminated. Moreover, the evidence of record does not establish that he had been offered, or had accepted, a different position prior to the termination of his employment. Consequently, he has not come forward with any basis for monetary or equitable relief un-

---

[37] *See Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 293 (7th Cir. 1996) (noting that the affidavit supplied "the missing causal link between the store and the fall").

der § 2617, and Protective was entitled to summary judgment. Accordingly, the district court's judgment is affirmed.

AFFIRMED